Nicholas **FELVER,** Plaintiff,

v.

Jo Anne B. **BARNHART,** Commissioner of Social Security, Defendant.

**Cause No. 1:02–CV–182.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Feb. 13, 2003.

Joseph W. Shull, Fort Wayne, IN, for plaintiff.

Deborah M. Leonard, Fort Wayne, IN, for defendant.

### MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court[1] for judicial review of a final decision of the

---

**1.** Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

defendant, Commissioner of Social Security ("Commissioner"), denying the application of the plaintiff, Nicholas Felver (the "Plaintiff"), for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") beginning November 11, 1997.

Section 205(g) of the Social Security Act ("the Act") provides, *inter alia*, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g).

The Plaintiff seeks a remand to Social Security for further review under both sentence four and sentence six of 42 U.S.C. § 405(g).

## II. THE PROCEDURAL AND FACTUAL BACKGROUND

### A. The Procedural Background

On February 10, 1998, the Plaintiff filed an application for DIB and SSI, alleging an inability to work beginning November 11, 1997. The Plaintiff's claims were denied initially and upon reconsideration. On April 29, 1999, a hearing was held before the Administrative Law Judge Ann C. Grover (the "ALJ"). The Plaintiff was represented by counsel and testified at the hearing. Also testifying were the Plaintiff's grandfather, George Litick, Cara Hobbs, a friend, and Christopher Young, a vocational expert (the "VE"). Following this hearing, the record was left open and on July 11, 2000, a subsequent hearing was held at which the Plaintiff, the same VE, and Melanie Miller, the Plaintiff's fianceé, testified.

On August 25, 2000, the ALJ issued her decision wherein she made the following findings:

1. The claimant met the disability insured status requirements of the Act on November 11, 1997, the date the claimant stated he became unable to work, and has acquired sufficient quarters of coverage to remain insured only through June 30, 1999.

2. The claimant has not engaged in substantial gainful activity since October 1997.

3. The medical evidence establishes that the claimant has a seizure disorder and a factitious disorder, impairments which are severe but which do not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's statements concerning his impairment and its impact on his ability to work are not entirely credible. The testimony of Cara Hobbs and Melanie Miller is also not entirely credible.

5. The claimant has no exertional limitations which interfere with his ability to work. He is not able to work around any hazards, and he is restricted to low stress work, with no moments of high stress that are critical to the performance of the job. The claimant's residual functional capacity was the same on his date of last insured through the date of this decision.

6. The claimant is unable to perform his past relevant work as a security guard, construction laborer, farm helper, welding machine operator, and wire worker.

7. The claimant's non-exertional limitations significantly narrow the range

of work he is now capable of performing.

8. On the date his insured status expired, the claimant was 33 years old, a "younger individual."

9. The claimant has a limited education.

10. Considering the claimant's age, educational background, and residual functional capacity, he is able to make a successful vocational adjustment to work which exists in significant numbers in the national economy. Examples of such work in the regional and national economies include work as a maid (350 positions), office cleaner (250 positions), and mail sorter (400 positions). Medical–Vocational Rule 204.00 provides a framework for decision making.

11. The claimant has not been under a disability, as defined in the Social Security Act, at any time through the date his insured status expired, or at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. at 27–28.)

Based on these findings, the ALJ determined that the Plaintiff was not entitled to DIB or SSI. The Plaintiff requested review by the Appeals Council, which was denied on April 8, 2002, leaving the ALJ's decision as the final decision of the Commissioner. This appeal followed.

The Plaintiff filed his opening brief on December 13, 2002. The Commissioner filed her "Memorandum in Support of the Commissioner's Decision" on January 27, 2003. The Plaintiff replied on February 11, 2003.

### B. The Factual Background

The Plaintiff was thirty-two (32) years old in November 1997, the alleged onset date of disability, a "younger individual" as defined in the Act.[2] *See* 20 C.F.R. § 404.1563(c).

The Plaintiff has a tenth (10th) grade education and has previous work activity as a security guard, construction worker, packer, landscape laborer, farm laborer, wire worker, and welding machine operator.

The Plaintiff claims a disability due to mild mental retardation, a seizure disorder, and neurovasal syncope.

On November 11, 1997, the Plaintiff was admitted to the Emergency Room of Marion General Hospital for nausea and dizziness. (Tr. at 174). Moreover, the Plaintiff reported having progressive problems with blacking out, and having such spells about every other day, including the day before going to the emergency room. (*Id.*) The Plaintiff related that during these black outs, he typically loses consciousness for several minutes, sometimes lasting as long as 30 to 40 minutes. (*Id.*) Additionally, the Plaintiff noted that the black outs first began occurring when he was under significant emotional stress, but that they now seem to occur at any time. (*Id.*)

While in the emergency room, the Plaintiff became diaphoretic and his heart rate dropped to about 45, his blood pressure had dropped to about 70/33, and he went into a junctional rhythm.[3] (Tr. at 175).

---

2. The Plaintiff was thirty-three years old on the date his insurance expired for SSI purposes and on the date of the first administrative hearing. He was thirty-five (35) years old on the date of the second hearing.

3. Junctional rhythm (sometimes called atrioventricular nodal rhythm) is a heart rhythm associated with an upward spread of impulses from the atrioventricular junction of the atria (upper chambers) rather than the normal spread downward of the impulses from the sinoatrial node to the atrioventricular junc-

However, he recovered spontaneously. (*Id.*)

The hospital staff tried to convince the Plaintiff to be admitted for further evaluation; however, since he decided not to stay, the hospital provided him with an outpatient EEG and event recorder. (Tr. at 176).

This monitor revealed the Plaintiff to have a normal rhythm, but recorded other symptoms: "unresponsive, eyes flutter, dizzy, periods of apnea, spasms to the right side, tired, chest hurt, body jerking, shallow breathing." (Tr. at 183).

On January 6, 1998, the Plaintiff was seen by Dr. Gary A. Frick, a board certified cardiologist. (Tr. at 216). He was scheduled for a tilt-table test but a black out postponed the test. (*Id.*) The Plaintiff described this episode as a sweaty-type of discomfort, queasy, or like the "shade coming down." (*Id.*) Dr. Frick opined that the Plaintiff likely experienced a vasodepressor or cardioinhibitory syncope. (*Id.*)

On January 9, 1998, the Plaintiff saw Dr. Sudodh Gupte, another cardiologist, with complaints of sweating, followed by pounding and near fainting, and noted that he has had black outs over the course of 1–1½ years. (Tr. at 214). Dr. Gupta noted the trouble physicians had in diagnosing the Plaintiff, and suggested that his symptoms may be related to stress rather than disease. (*Id.*)

On January 13, 1998, the Plaintiff saw Dr. Vincent J. Pompili, an Assistant Professor of Medicine at Indiana University, reporting numerous black outs and near black outs almost every other day, and he described symptoms of rapid pounding in his chest sometimes followed by nausea, and he noted that he occasionally passed out for up to 50 minutes. (Tr. at 219). Dr. Pompili noted that the Plaintiff's episodes were of uncertain etiology, but that

one episode in the hospital was potentially associated with bardycardia. Dr. Pompili noted that the Plaintiff's symptoms are quite atypical especially with the prolonged reports of being unconscious for greater than 50 minutes. (*Id.*) He opined that there was a possible supratentorial component to his black outs. (*Id.*)

On January 27, 1998, the Plaintiff returned to Dr. Pompili, who noted that the Plaintiff had an atypical history of black outs with some questionable evidence of seizure activity, and a positive tilt table test which infers a neurovascular component. (Tr. at 221.) However, Dr. Pompili was convinced that the neurovascular component was the only pathophysiologic process associated with it due to the inability to awake for two or three hours. (*Id.*)

On January 30, 1998, the Plaintiff saw Dr. Omkar Markand, a Professor of Neurology at Indiana University. (Tr. at 223–225). Dr. Markand noted that the Plaintiff had a rare skin disease which involved his scalp, and that he had been classified as mildly mentally handicapped and placed in special education until the last year of school completed. (Tr. at 224). During the neurological examination, the Plaintiff had difficulty with even simple calculations, and although he was able to tell the number of quarters in a dollar, he could not calculate the number in five dollars. (*Id.*) He knew the president but not the vice president, and his knowledge of current events was somewhat limited. (*Id.*) Dr. Markand's impression was a differential diagnosis which would include complex seizures versus pseudoseizures. (*Id.*)

On February 15, 1998, the Plaintiff went to the Marion General Hospital Emergency Room for seizure activity. (Tr. at 228). On arrival it was noted that he was "semi-alert," but that his "eyes rolled back in his

tion. *See Stedman's Medical Dictionary,* 1235

(5th L.Ed.1982) (hereinafter *"Stedman's "*).

head," and he claimed to have been under significant stress. (*Id.*) After being admitted for prolonged monitoring, two habitual episodes were induced by hyperventilation with the first being characterized by eye fluttering, staring, pupils dilated but reactive to the light, stiff neck and unresponsiveness lasting approximately six minutes. (Tr. at 233–234). He was referred to Dr. Elizabeth Bowman, a psychiatrist. (*Id.*)

On April 18, 1998, an ambulance was dispatched to the Plaintiff's home, but upon arrival, he appeared to be in no distress of any type. (Tr. at 357).

On May 5, 1998, the Plaintiff was seen by Dr. Velma Jean Atkinson, a psychologist, for a consultative psychological evaluation at the request of Social Security. (Tr. at 236–242). Dr. Atkinson noted that she was provided with two reports in which the physicians were unable to find a physiological explanation for the episodes. (Tr. at 237). During the mental status examination, while the Plaintiff knew that the sun rose in the east, he did not know why oil floats on water or the direction from Chicago to Panama. (*Id.*) He was asked to name five presidents, but he could only name four. (*Id.*) He did not know the capital of Italy or who wrote Hamlet. (*Id.*) He was able to comprehend some but not all of the similarities as he was unable to identify any similarity between an egg and a seed, mountain and a lake, and a poem and a statue. (*Id.*) He could calculate addition problems presented verbally, but he made errors on subtractions and could not do multiplication or

division (Tr. at 238). He could not subtract serial 7's or 3's. (*Id.*) In regard to memory he recited four digits forward and three digits backward, and he remembered three out of five objects after 20 minutes. (*Id.*) She noted that he spoke in a very low tone and mumbled, and he did not express himself. (*Id.*) He made little eye contact, but he did not exhibit any thought disorder. (*Id.*)

Dr. Atkinson administered the Welscher Adult Intelligence Scale III ("WAIS–III"), on which the Plaintiff scored a Verbal IQ score of 66, a Performance IQ score of 72, and a Full Scale IQ score of 66. (Tr. at 239). She noted that these scores place him in the Mentally Retarded Range of intellectual functioning.[4] (*Id.*) Dr. Atkinson noted that these scores reasonably reflected his ability, but found his cooperation to be minimal and disinterested. (*Id.*)

Dr. Atkinson also expressed concern about the honesty of the Plaintiff's efforts, and she thought that he may be attempting to produce a poor performance in an effort to look as though he was impaired. (*Id.*) She felt that further testing may produce slightly higher scores. (*Id.*)

She noted that lack of physical evidence and performance during the mental status and intelligence testing might indicate the presence of a factitious disorder.[5] (*Id.*)

On June 24, 1998, the Plaintiff saw Dr. Elizabeth Bowman, a psychiatrist at the Indiana University Medical Center (Tr. at 256–258). During the mental status examination, Dr. Bowman noted that the

---

4. Although IQ scores alone do not completely diagnose mild mental retardation, scores in the range of 50–55 to approximately 70 are within this classification. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders*, 40 (4th ed. 1994) ("*DSM–IV*"). A borderline intellectual functioning IQ falls in the 71–84 range. *DSM–IV* at 684.

5. Factitious disorder is marked by physical or psychological symptoms that are intentionally produced or feigned in order to "assume the sick role," although the individual is not aware of the motivation behind the factitious behavior. *DSM–IV*, at 513–14. This is distinct from Malingering, where the individual feigns symptoms intentionally, but has an obvious goal in mind (i.e., avoiding jury duty, standing trial, conscription in the military). (*Id.*)

Plaintiff was unable to perceive his own feelings. (*Id.*) His mood was not easily identifiable, but he appeared to be somewhat depressed in affect, and his thought content revealed a man who chronically perceives rejection from others and feels a good deal of sadness and anger inside but cannot easily describe it. (*Id.*) He appeared to actively avoid responsibility for his difficulties, and he seemed to be escaping into a dissociative trances when feelings become too much. (*Id.*) His insight was minimal, and his judgment appeared to be poor, as he had difficulties with honesty and fidelity with his wife. (*Id.*)

In Dr. Bowman's opinion, the Plaintiff had non-epileptic seizures, which were probably a dissociative attempts to escape from overwhelming affect because of his difficulty with verbal expression and his alexithymia (Tr. at 258). She also noted that he had "Un Coup De Sade" which is a very rare skin condition. (*Id.*)

She told him that he needed to talk about his problems if he was to stop his non-epileptic episodes, but she thought that his diagnosis was relatively poor because he was seeking disability and appeared to have a long history of not taking responsibility for his difficulties. (*Id.*) Additionally, Dr. Bowman noted that his alexithymia would make it very difficult for him to use the psychotherapy that he needs to solve his problems. (*Id.*)

On September 24, 1998, the Plaintiff returned to Dr. Pompili, who noted that his episodes had not changed since he was taken off beta-blockers. (Tr. at 313).

On January 26, 1999, the Plaintiff went to the Lutheran Hospital Emergency Room for a temperature and flu and cold symptoms. (Tr. at 362–363). On physical exam he was described as mal-nourished with questionable hygiene. (Tr. at 363). While his blood was being drawn, the Plaintiff went into a black out spell for approximately 10 minutes. (*Id.*) He was given a cardiac chest massage and he came out of it. (*Id.*) X-rays were positive for pneumonia. (*Id.*)

On March 23, 1999, an ambulance was dispatched to the Wabash County Jail, where the Plaintiff was incarcerated and found unresponsive on the floor of his cell. (Tr. at 346). He was described as unresponsive to painful stimuli, and his pupils were dilated and unresponsive. (*Id.*) When he awoke, he was described as confused. (*Id.*)

On March 27, 1999, an ambulance again came to the jail, and the Plaintiff was found lying in his cell unresponsive to verbal stimuli. (Tr. at 334). His eyes were opening and closing and fluttering back and forth. (*Id.*) He was stiff without movement. (*Id.*) And checking him into the Wabash Hospital, a jail officer described him as "stiff as a board and unresponsive for 30 minutes." (Tr. at 319).

On May 17, 1999, he saw Dr. Javaid Iqval, a neurologist, who decided to take an MRI of the brain. (Tr. at 370–371).

On May 26, 1999, the MRI was administered, and it showed essentially a "normal MR of the head." (Tr. at 369).

Apparently the Plaintiff had an appointment with Dr. Iqval for October 18, 2000, but he failed to show up. (Tr. at 375). Additionally, Dr. Iqval's office turned over the Plaintiff's account to a collection agency due to his failure to pay $15 a month, and Dr. Iqval refused to see the Plaintiff until his account was settled. (*Id.*)

## III. STANDARD OF REVIEW

■ To be entitled to Social Security benefits, the Plaintiff must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12

months...." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). It is not enough for the Plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the Plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff,* 307 F.2d 840, 844 (4th Cir.1962), *cert. denied,* 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963); *Garcia v. Califano,* 463 F.Supp. 1098 (N.D.Ill.1979).

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen,* 841 F.2d 710, 711 (7th Cir.1988); *Bowen v. Yuckert,* 482, U.S. 137, 482 U.S. 137, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nolen v. Sullivan,* 939 F.2d 516, 518 (7th Cir.1991) (citing *Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)); *Nelson v. Bowen,* 855 F.2d 503, 504 n. 2 (7th Cir.1988); *accord*

*Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001); *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir.2001). A claimant has the joint burdens of production and persuasion through at least step four, where the individual's residual functional capacity ("RFC") is determined. *Yuckert,* 482 U.S. at 146 n. 5, 107 S.Ct. 2287; 20 C.F.R. §§ 404.1545, 416.945. At step five the Commissioner bears the burden of proving that there are jobs in the national economy the plaintiff can perform. *Herron v. Shalala,* 19 F.3d 329, 333 n. 18 (7th Cir.1994). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

## IV. DISCUSSION

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker,* 732 F.2d 605, 607 (7th Cir.1984) (citing *Whitney v. Schweiker,* 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. § 405(g)); *Burnett v. Bowen,* 830 F.2d 731, 734 (7th Cir.1987). "Substantial evidence" has been described as "more than a mere scintilla." *Anderson v. Bowen,* 868 F.2d 921, 923 (7th Cir.1989). It means, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion...." *Id.* (quoting *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)); *see also Allen v. Weinberger,* 552 F.2d 781, 784 (7th Cir.1977). "If the record contains such support [it] must [be] affirmed ... unless there has been an error of law." *Garfield,* 732 F.2d at 607; *see also Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present case, the ALJ found that the Plaintiff had not engaged in any substantial gainful activity since the alleged onset date. At step two, the ALJ found that the Plaintiff's impairments were se-

vere; however, the ALJ found that the Plaintiff's impairments do not meet or exceed one of the listed impairments under step three. Under step four, the ALJ found that the Plaintiff was precluded from returning to his past relevant work. However, under step five, the ALJ found the Plaintiff capable of making a vocational adjustment to perform work at the light unskilled level in the region as a maid, an office cleaner and a mail sorter.

The Plaintiff contends that the ALJ committed reversible error, necessitating a sentence four remand, by improperly assessing his intellectual functioning, and improperly characterizing stress as a job limitation rather than part of the Plaintiff's RFC. The Plaintiff also argues that a sentence six remand is appropriate to consider new evidence that his high school considered him to be Mildly Mentally Handicapped.

## A. The ALJ Properly Assessed the Plaintiff's Intellectual Functioning

 The Plaintiff claims that the ALJ erred by finding that his intellectual functioning did not satisfy the listing for mental retardation, 20 C.F.R. part 404, subpart P, appendix § 12.05 ("Listing 12.05"), or amount to borderline intellectual functioning, as defined by the *DSM–IV*. Specifically, the Plaintiff faults the ALJ for discounting an IQ test administered by Dr. Atkinson because its results were of "doubtful validity." (Tr. at 22.)

Listing 12.05 defines mental retardation as "a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested dur-

ing the developmental period (before age 22)." Under Listing 12.05(C), a claimant is automatically entitled to benefits due to mental retardation when he has "[a] *valid* verbal, performance, or full scale IQ of 60 through 70" and "a physical or other mental impairment imposing additional and significant work-related limitation of function." Listing 12.05(C) (emphasis added); *see also Maggard v. Apfel,* 167 F.3d 376, 379 (7th Cir.1999).

The Plaintiff argued before the ALJ that his verbal and full scale IQ scores of 66 on the WAIS–III test satisfied the first prong of Listing 12.05(C).[6] (Tr. at 239.) However, the text of Listing 12.05(C) requires an IQ score to be "valid," and the ALJ found that Plaintiff's IQ scores were invalid.

The Plaintiff argues that the ALJ should have adopted these IQ scores because Dr. Atkinson, stated that "[t]hese scores are likely a reasonable reflection of [the Plaintiff's] ability." (*Id.*) However, the ALJ's finding that the Plaintiff's IQ scores are invalid is supported by substantial evidence. Dr. Atkinson states that the Plaintiff's "cooperation was minimal and disinterested" and his "attitude left some concern over his honest efforts. It may be that he was attempting to produce a poor performance in an effort to look as though he [is] impaired." (Tr. at 239.) Indeed, the invalidity of these scores is further bolstered by the fact that Dr. Atkinson's Axis II[7] diagnosis was deferred, indicating that she did not put enough faith in the accuracy of the Plaintiff's IQ scores to make a diagnosis, and needed additional testing to make a decision. (*Id.*)

---

**6.** The Plaintiff also scored a performance IQ of 72, but Social Security's regulations require the ALJ and the Court to consider the Plaintiff's lowest scores. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D).

**7.** The *DSM–IV* calls for a multiaxial system of assessment, in which the clinician provides information on five separate axes. Axis II is used to report mental retardation based on a patient's WAIS testing scores. *DSM–IV* at 27–29.

■ Nevertheless, the Plaintiff interprets Dr. Atkinson's statement that future testing "may produce *slightly* higher scores," (*id*) (emphasis added), to mean that future testing would still reveal an IQ less than 70. However, such psychological guesswork is not the providence of either the Court or the ALJ, who must never substitute her own judgment for that of the physician. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir.2000). And because Dr. Atkinson has provided no clue as to what she meant by "slightly higher," it is not the job of the Court to divine such a definition for her.

■ The Plaintiff also suggests that even if his IQ is greater than 70, then "slightly higher" means that his IQ is between 71 and 84, the benchmark for "borderline intellectual functioning" under the *DSM–IV*, and the ALJ erred by not to including this limitation in the hypothetical question posed to the VE. However, once again, the ALJ was not required to draw this tenuous inference from Dr. Atkinson's somewhat cryptic comment, and to do so would have flown in the face of the regulations, which require a "mental impairment [to] be established by medical evidence consisting of signs, symptoms, and laboratory findings[.]" 20 C.F.R. § 1508. But here, there is simply no medical evidence in the record indicating that the Plaintiff has borderline intellectual functioning. Indeed, no psychologist, psychiatrist or clinician ever diagnosed the Plaintiff with borderline intellectual functioning, and no IQ tests, besides the invalid one administered by Dr. Atkinson, ever placed the Plaintiff's IQ between 71 and 84. Thus, because there is simply no medical evidence of borderline intellectual functioning in the record, the ALJ did not err by not including this limitation in his hypothetical, and we conclude that her decision on this point is supported by substantial evidence.

■ Moreover, the Plaintiff takes issue with the ALJ's finding that the Plaintiff had no record of mental retardation while in school, an apparent reference to the introductory paragraph of Listing 12.05 (i.e., mental retardation is "initially manifested during the developmental period (before age 22)"). Specifically, the Plaintiff contends that just because those school records were not in the record does not mean they never existed since they "may have been lost or destroyed, or the present records may require interpretation." (Pl.'s Opening Br. at 15–16.) However, because no such evidence was in the record before the ALJ, we see no error and find her decision supported by substantial evidence.

■ Finally, the Plaintiff appears to suggest that the ALJ erred by considering the Plaintiff's ability to perform the daily activities of independent living as some indication of whether he is mentally retarded. However, Listing 12.05(A) provides that mental incapacity may be evidenced by dependance on others for personal needs like toileting, eating, dressing, or bathing, and Listing 12.05(D)(1) provides that a marked restriction in the activities of daily living may be one factor in finding mental retardation. Thus, it was clearly proper for the ALJ to take the Plaintiff's ability to perform daily activities into account in assessing his intellectual functioning.

Accordingly, the ALJ's decision regarding the Plaintiff's intellectual functioning will be affirmed as it is supported by substantial evidence.

**B. The ALJ Failed to Properly Account for Stress**

■ The Plaintiff contends that the ALJ erred by using "low stress" as a characteristic of jobs. In her determination of the Plaintiff's RFC, the ALJ found that the Plaintiff's work should be limited to jobs

that would accommodate the Plaintiff's severe mental impairments, including his limited ability to cope with stress, which "may trigger a black-out or a dissociative state[.]" (Tr. at 23). These limitations include "restrict[ing the Plaintiff] to work with no hazards, and low stress work with no moments of high stress which are critical to the performance of the job." (Tr. at 26.)

The Plaintiff relies on *Lancellotta v. Secretary of Health and Human Servs.*, 806 F.2d 284, 285 (1st Cir.1986), where the court observed that "stress is not a characteristic of a job, but instead reflects an individual's subjective response to a particular situation." *See also Clifford,* 227 F.3d at 868 n. 2 ("[t]he use of the term 'low stress' is somewhat of a misnomer because stress lies in the individual not in the job."); *Durrett v. Apfel,* 2000 WL 680430, *7 (S.D.Ind. March 27, 2000); *Weiler v. Shalala,* 922 F.Supp. 689, 699 (D.Mass. 1996); SSR 85–15. In *Lancellotta,* ALJ found that the claimant could perform "non-stressful" work activity and the VE testified that there are a significant number of jobs an average person would consider low stress. *Lancellotta,* 806 F.2d at 285. However, the First Circuit reversed, finding that the ALJ's decision was not supported by substantial evidence because SSR 85–15, which addresses stress and mental illness, recognizes that reaction to stress is "highly individualized," that mentally impaired individuals "may have difficulty meeting the requirements of even so-called 'low-stress' jobs," and that the Commissioner must make specific findings about the nature of the claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work. *Id.* (quoting SSR 85–15.)

Indeed, SSR 85–15 requires an ALJ to undertake a subjective, individualized inquiry into what job attributes are likely to produce disabling stress in the claimant, and what, if any, jobs exist in the economy that do not possess those attributes:

> Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. *The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.* A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

> \* \* \* \* \* \*

> Determining whether [mentally impaired] individuals will be able to adapt to the demands or "stress" of the work place is often extremely difficult. This section is … intended … to emphasize the importance of thoroughness in evaluation on an individualized basis.

SSR 85–15 (emphasis added). *See also* SSR 85–16 ("Consideration of these factors [the abilities to understand, carry out and remember instructions; respond appropriately to supervision, coworkers; and deal with customary work pressures] is required for the proper evaluation of the severity of mental impairments.")

However, in this case, as in *Lancellotta,* the ALJ concluded that the Plaintiff could only perform low stress work and, relying on the testimony of the VE, ascertained

that there are a significant number of jobs in the economy that would be low stress for the average worker. But "even if most individuals would not find it particularly stressful to do the jobs listed in the ALJ's decision, we have no evidence showing that [the Plaintiff], who suffers from a severe mental impairment, would react the same way." *Lancellotta*, 806 F.2d at 285. Indeed, the ALJ made no findings about how the Plaintiff's stress affects his ability to understand, carry out and remember instructions, respond appropriately to supervision, and coworkers, and deal with customary work pressures. Thus, not having fully painted this vocational picture, the ALJ failed to elicit testimony from the VE directed to the Plaintiff's particular stress-causing condition or conditions. *See, e.g., id.* In light of these deficiencies, we cannot say that the ALJ's decision on this point is supported by substantial evidence, and we will remand the case for further development of this issue.

## C. A Sentence Six Remand is Appropriate

■ Finally, the Plaintiff submits that this case should be remanded for the consideration of new evidence under the sentence six of 42 U.S.C. § 405(g) (i.e., a "sentence six remand").[8] *See, e.g., Melkonyan v. Sullivan*, 501 U.S. 89, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991) (recognizing that Congress created two methods of remand under § 405(g), a sentence four and a sentence six remand). The new evidence consists of a letter from the director of special education for Plaintiff's former school corporation indicating that the Plaintiff was enrolled in special education classes there and was considered "mildly mentally handicapped." Also enclosed with this letter is a copy of the sole remaining school record of the Plaintiff's special education status, a 3 by 5 inch card containing the Plaintiff's name, social security number, and the letters "MiMH," which apparently indicate that he was mildly mentally handicapped.

■ The Social Security Act explicitly permits federal courts to remand a case to the SSA "at any time" for a new determination if there is new evidence for the SSA to consider. 42 U.S.C. § 405(g). However, remand is appropriate only if the Plaintiff shows that the additional evidence is new and material, and that he has good cause for failing to incorporate it into the record in a prior proceeding. *See Richmond v. Chater*, 94 F.3d 263, 268 (7th Cir.1996); *Anderson*, 868 F.2d at 927; *Sears v. Bowen*, 840 F.2d 394 (7th Cir. 1988); *Bauzo v. Bowen*, 803 F.2d 917, 926 (7th Cir.1986). Here, the Commission concedes that this evidence is new and that the Plaintiff has demonstrated good cause for failing to incorporate it into the record in a prior proceeding, therefore, we will focus on whether this evidence is material.

■ "Materiality" means that there is a "reasonable probability" that the Commissioner would have reached a different conclusion had the evidence been considered. *Perkins v. Chater*, 107 F.3d 1290,

---

**8.** Sentence six of 42 U.S.C. § 405(g) provides: "The court may, on motion of the Secretary made for good cause shown before he files his answer, remand the case to the Secretary for further action by the Secretary, and it may at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Secretary shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm his findings of fact or his decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based."

1296 (7th Cir.1997); *Sample v. Shalala,* 999 F.2d 1138, 1144 (7th Cir.1993).

The Plaintiff contends the new evidence is material because it shows that the Plaintiff was considered disabled before age 22 (a requirement for "mental retardation" found in the introductory paragraph of Listing 12.05), corroborates his IQ scores, and may help establish that he has at least borderline intellectual functioning.

The Commissioner objects to a sentence six remand, arguing that this new evidence is not material because it contains no treatment findings, doctor's opinion, or medical diagnoses regarding mental retardation or borderline intellectual functioning. Moreover, the Commissioner claims it is immaterial because it does not reveal any specific information such as how long the Plaintiff received special services, what those services were, or what criteria the school corporation used to determine that the Plaintiff was mildly mentally handicapped.

However, a review of the record reveals that the ALJ afforded considerable weight to the absence of *any* evidence indicating that the Plaintiff was enrolled in special education classes in school. Indeed, the ALJ discussed this fact in some detail when considering both the Plaintiff's intellectual functioning and credibility. However, this new evidence reveals that the Plaintiff was considered mildly mentally handicapped, and possibly mentally retarded, prior to age 22, and this evidence at least partially supports the Plaintiff's credibility. Thus, we conclude that this new evidence is material, and as this case is being remanded for reconsideration of the stress issue, the Court will also direct the ALJ to consider the Plaintiff's new evidence in determining whether he was disabled during the relevant time period.

## CONCLUSION

Accordingly, the decision of the ALJ is AFFIRMED on the issue of the Plaintiff's intellectual functioning, but REMANDED, under sentence four of 42 U.S.C. § 405(g), on the issue of the assessment of stress, and under sentence six of 42 U.S.C. § 405(g), for consideration of the Plaintiff's *new evidence.* SO ORDERED.